## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| DAVID EHRLICH, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 1:21-CV-01020 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### UNITED STATES' ANSWER AND COUNTERCLAIM

The United States, for its answer, responds to the numbered paragraphs of Plaintiff's Complaint as set forth below.

1.     The United States admits the allegations in paragraph 1 of the Complaint.

2.     The United States admits the allegations in paragraph 2 of the Complaint.

3.     The United States admits the allegations in paragraph 3 of the Complaint.

4.     The United States admits the allegations in paragraph 4 of the Complaint.

5.     The United States admits the allegations in paragraph 5 of the Complaint.

6.     The United States denies the allegations set forth in paragraph 6 of the Complaint, except admits that Plaintiff seeks to challenge a civil penalty assessment made against him under 26 U.S.C. § 6700.

7.     The United States denies the allegations set forth in paragraph 7 of the Complaint, except admits that an IRS Revenue Agent issued an Explanation of Items, and admits that Exhibit 1 to the Complaint appears to be what it purports to be.

8.     The United States admits the allegations in paragraph 8 of the Complaint.

9.     The United States admits the allegations in paragraph 9 of the Complaint.

10.    The United States admits the allegations in paragraph 10 of the Complaint.

11.     The United States admits the allegations set forth in the first sentence of paragraph 11 of the Complaint. The United States denies the allegations set forth in the second sentence of paragraph 11 of the Complaint.

12.     The United States denies the allegations set forth in paragraph 12 of the Complaint, except admits that Plaintiff seeks a refund of $35,000 and seeks to challenge his liability for the Section 6700 penalty assessed against him.

13.     The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Complaint.

14.     The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Complaint.

15.     The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 15 of the Complaint.

16.     The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 16 of the Complaint.

17.     The United States admits that Abbey Art acquired artworks for its customers.  The United States lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 17 of the Complaint.

18.     The United States admits that, in multiple instances, Abbey Art charged its customers more for artworks than Abbey Art had paid for those artworks.  The United States lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 18 of the Complaint.

19.     The United States admits that at some point before 2015 Abbey Art began to facilitate the purchase and ultimate donation of artworks by its customers.  The United States

lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 19 of the Complaint.

20.     The United States denies the allegations in paragraph 20 of the Complaint.

21.     The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 21 of the Complaint.

22.     The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 22 of the Complaint.

23.     The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23 of the Complaint.

24.     The United States incorporates its responses to paragraphs 1 through 23 above as if fully stated herein.

25.     The United States admits that 26 U.S.C. § 7491(c) states: "Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title."  The United States denies the remaining allegations in paragraph 25 of the Complaint.

26.     The United States denies the allegations in paragraph 26 of the Complaint.

27.     The United States denies the allegations in paragraph 27 of the Complaint.

28.     The United States denies the allegations in paragraph 28 of the Complaint.

29.     The United States denies the allegations in paragraph 29 of the Complaint.

30.     The United States denies the allegations in paragraph 30 of the Complaint.

31.     The United States denies the allegations in paragraph 31 of the Complaint.

32.     The United States denies the allegations in paragraph 32 of the Complaint.

33.     The United States denies the allegations in paragraph 33 of the Complaint.

34.     The United States denies the allegations in paragraph 34 of the Complaint.

35.     The United States denies the allegations in paragraph 35 of the Complaint.

36.     The United States admits that Plaintiff knew of, or had reason to know of, the Tax Court's opinion in *Williams v. Commissioner*, T.C. Memo 2011-89, 2011 WL 1518581, shortly after it was issued.  The United States lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 36 of the Complaint.

37.     The United States denies the allegations in paragraph 37 of the Complaint.

38.     The United States denies the allegations in paragraph 38 of the Complaint.

39.     The United States denies the allegations in paragraph 39 of the Complaint.

WHEREFORE, the United States requests that the Court deny the relief requested in the complaint, enter judgment dismissing the complaint with prejudice, and grant the United States such other and further relief as the Court deems just and proper, including awarding the United States its costs incurred herein.

## COUNTERCLAIM AGAINST DAVID EHRLICH

The United States, for its counterclaim against plaintiff David Ehrlich, alleges as follows.

1.     This counterclaim seeks to reduce to judgment the remaining balance of a penalty that a delegate of the Secretary of the Treasury assessed, pursuant to 26 U.S.C. § 6700, against David Ehrlich based on Ehrlich's organization, promotion, and sale of an art donation scheme that took place for multiple years as described in detail below.

2.     This counterclaim is asserted, pursuant to 26 U.S.C. § 7401, at the direction of the Attorney General of the United States with the authorization and at the request of the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury.

3.     This Court has subject matter jurisdiction over this counterclaim under 28 U.S.C.

§§ 1340 and 1345, and 26 U.S.C. §§ 7401 and 7402.

## OVERVIEW OF EHRLICH'S ART DONATION SCHEME

4.      Ehrlich organized, promoted, and sold an art donation scheme, and made false statements to his customers about the availability of federal income tax deductions through the scheme.

5.      In essence, Ehrlich's scheme was to acquire cheap artworks abroad and sell them to his customers in the United States with a package of services that included grossly inflated appraisals.  The purpose of the scheme was to enable the customers to donate the artworks to a charity, or purported charity, and claim large income tax deductions based on the appraised value of the artworks.

6.      Ehrlich operated the art donation scheme through Abbey Art Consultants, Inc. ("Abbey Art").

7.      Ehrlich formed Abbey Art in 1993 as a Delaware corporation.

8.      D.E. Trust owns 100% of the shares of Abbey Art.

9.      D.E. Trust is a grantor trust of which Ehrlich is the only fiduciary.

10.      At all times relevant to this counterclaim, Ehrlich had sole ownership of and control over Abbey Art through D.E. Trust.

11.      At all times relevant to this counterclaim, Ehrlich was President of Abbey Art.

12.      Ehrlich performed work for Abbey Art and generally reported the income he received from Abbey Art to the IRS as consulting income.

13.      Aside from Ehrlich, Abbey Art had one full-time employee, Employee 1, and also retained at least two other individuals as independent contractors.

14.      Ehrlich hired Employee 1 and Abbey Art's contractors.

15.      Employee 1 and Abbey Art's contractors worked at Ehrlich's direction and

control.

16.     In and around the period from 2015 through 2017, Abbey Art sold the scheme to at least 18 customers.

17.     Ehrlich received gross income of at least $461,448 from the scheme.

18.     Ehrlich and his agents arranged for donee organizations to accept the artworks Abbey Art's customers purchased.

19.     The majority of donations Abbey Art's customers made were to an entity called Help for Orphans International ("Help for Orphans"), an organization controlled by Ehrlich's wife.

20.     Ehrlich and his agents represented to Abbey Art's customers that they could claim income tax deductions if they purchased Abbey Art's artworks and services, followed Abbey Art's instructions, and relied on the appraisals Abbey Art furnished.

21.     The appraisals Abbey Art furnished to its customers were bogus and grossly overstated the fair market value of the artworks.

22.     The appraisals purported to rely on "comparable market prices" or "comparative market data" as methods for valuing the artworks, but failed to identify any arms-length sales of comparable artworks, or any market evidence at all.

23.     Moreover, the deductions Abbey Art's customers claimed on their income tax returns were not allowable because the customers did not have legal ownership of the artworks for more than a year.  At most, Abbey Art's customers paid a deposit for the artworks a year or more prior to donating them, but they never had possession or control of the artworks, and had no written or other contractual obligation to complete the purchase.  Several customers, moreover, did not make any payment on the artworks until after they claimed to have donated

them.

24.     The deductions Abbey Art's customers claimed also were not allowable because the appraisals Abbey Art provided to them failed to meet the requirements to constitute "qualified appraisals" under the Internal Revenue Code, including the requirement to identify similar properties sold in contemporaneous arms-length transactions.

25.     The deductions Abbey Art's customers claimed further were not allowable because the appraisers Abbey Art hired were not "qualified appraisers" as required by the Internal Revenue Code because, among other reasons, they performed the majority of their appraisals for Abbey Art and its customers.

26.     Finally, in some instances, Ehrlich and/or his agents told customers that they had delivered artworks to a donee on the customers' behalf and customers relied on that representation in claiming a deduction, but Ehrlich and his agents never actually delivered the artworks and no donation occurred.

**EHRLICH'S SCHEME - STEP ONE:  ABBEY ART'S CUSTOMERS "PURCHASED"**
**THE ARTWORKS AND PURPORTED TO HOLD THEM FOR AT LEAST A YEAR**

27.     At all relevant times, the Internal Revenue Code required donated property to have been owned by the donor for at least a year prior to being donated in order for the donor to claim a deduction at the property's appraised fair market value rather than its cost basis (*i.e.*, generally its purchase price).  *See* 26 U.S.C. § 170(e).

28.     Abbey Art's customers failed to meet the holding period requirement referred to in paragraph 27 above.

29.     Abbey Art's customers never took physical possession of the artworks they purportedly purchased.  Rather, the artworks remained in the possession of Abbey Art, typically at a warehouse outside New York City that was leased to and controlled by Abbey Art.  Abbey

Art's customers did not have access to the warehouse.

30.     Abbey Art's customers typically purchased the artworks, or made a deposit payment on the artworks, without seeing them.

31.     Abbey Art's customers typically purchased the artworks, or made a deposit payment on the artworks, without knowing which specific artworks they were purportedly buying, or even what kind of artworks they were purportedly buying.

32.     Neither Abbey Art nor Ehrlich entered into a written agreement with their customers related to ownership of the artworks.

33.     Ehrlich organized his donation scheme so that in the ideal case, the customers would pay a small (roughly 5-10%) deposit on the artworks as window-dressing to purportedly establish ownership of them, then pay the balance a year or more later, shortly prior to making the donation.

34.     For example, on November 23, 2015, Ehrlich sent a letter to Customers 1 and 2, a married couple, stating:

> I am writing this letter to document that as of November 16, 2015 Abbey Art Consultants, Inc., has added to your investment account a diversified collection of art and antiquities with a fair market appraised value estimated in excess of $52,000.00. The total cost for the art is $11,440.00. Your deposit for this art is $1,100.

35.     The final paragraph of the letter informed the customers that there was a twelve-month holding period for the artworks prior to donating them to claim a deduction based on their fair market value rather than their cost.  The letter concluded:  "In this regard, this letter will confirm your ownership as of December 2015 [sic] of the subject art.  In the event you wish to gift objects in 2016, we will be pleased to work with you in this regard."

36.     Accordingly, Customer 1 made a deposit payment to Abbey Art of $1,100 on or about December 10, 2015, and made a second payment to Abbey Art of $10,300 on or about

December 5, 2016.  Customers 1 and 2 then claimed a charitable deduction for tax year 2016, reporting to the IRS on their income tax return that they had acquired the artworks in November 2015 for $11,400 and donated them to Help for Orphans in December 2016 at an appraised value of $55,000.

37.     Contrary to Ehrlich's statement, despite their deposit payment, Customers 1 and 2 did not obtain legal ownership of the donated property more than a year prior to the donation, and thus they were ineligible to claim a charitable contribution deduction equal to the artworks' purported fair market value.

38.     Moreover, in several instances Abbey Art's customers made a deposit payment on artworks a year or more prior to the claimed date of donation, but did not fully pay for the artworks until after they had purportedly donated them.

39.     Furthermore, in several instances Abbey Art's customers did not make any payment on artworks at all until after they had purportedly donated them. Those customers claimed to have owned the artworks for more than a year prior to the donation date based only on an unwritten agreement.

40.     For example, Customer 3 reported to the IRS on his 2015 income tax return that he had acquired artworks in October 2014 at a cost basis of $30,000 and donated them to Help for Orphans on December 28, 2015, at an appraised value of $150,450.  But Customer 3 did not make any payment for the artworks until September 2016 – nearly a year *after* he had claimed a tax deduction for purportedly donating them.

41.     At all relevant times, the Internal Revenue Code generally limited the maximum deduction allowable for non-cash charitable donations to 30% of a taxpayer's adjusted gross income.  *See* I.R.C. § 170(b)(1)(B).  Thus, Abbey Art's customers had an incentive not to buy

more artworks than they could claim deductions for.

42.     Ehrlich and/or his agents would provide customers with purported "estimates" of how much they would need to spend on artworks to reach a target donation amount.

43.     For example, Employee 1 wrote Customer 4 on November 23, 2017: "Abbey Art is in the process of transferring to your investment account a diversified collection of art and antiquities of 100 items with a Fair Market appraised value in excess of $150,000.  The total cost for the art is $33,000.  Your deposit for this art is $1,000."  Employee 1 then requested that Customer 4 send a deposit check for the artworks.

44.     Employee 1 stated that in the event an appraisal came back below an estimate Abbey Art had provided to a customer, Abbey Art would reduce the total price it had quoted the customer for the artworks.

45.     In several instances, Ehrlich and his agents sold artworks to customers after telling them that the artworks had already been appraised at prices far higher than Ehrlich was offering them to the customers.

46.     For instance, on March 8, 2017, Ehrlich emailed Customer 5:

Let's go to the Beverly Hills springs spa next week.  Did you determine how much art you need forv2016 [sic]? We have put aside appraised art of $180,000 at a cost of $38,000 with $10,000 down now and the balance due in August.  If you earned $600,000 gross for 2016 this is what you will need.  If you earned less just figure 30% of the applicable gross income. I need the deposit to pay the dealer who is holding your art.  Please send it by overnight courier to [address redacted].  Check payable to Abbey Art Consultants.  Thanks.

**EHRLICH'S SCHEME - STEP TWO:  EHRLICH COMMISSIONED AND FURNISHED GROSSLY INFLATED APPRAISALS FROM UNQUALIFIED APPRAISERS**

47.     Ehrlich and his agents arranged and furnished appraisals that his customers used for the purpose of claiming charitable deductions on the artworks they purchased.

48.     At all relevant times, the Internal Revenue Code required that taxpayers claiming

a charitable deduction of more than $5,000 based on donating non-cash property obtain a

"qualified appraisal" of the property from a "qualified appraiser."  *See* I.R.C. § 170(f)(11)

49.     In order to be a "qualified appraisal," an appraisal had to meet certain

requirements, including requirements to have been made within 60 days of the date of donation

and to state the "specific basis for the valuation, such as specific comparable sales

transactions…"  *See* 26 C.F.R. § 1.170A-13(c)(3).

50.     In order to be a "qualified appraiser," an appraiser had to meet certain

requirements, including the requirement that the appraiser not do the majority of their appraisal

work for the donor of the property being appraised, or for a party to the transaction in which the

donor acquired that property. *See* 26 C.F.R. §1.170A-13(c)(5).

51.     Ehrlich selected the appraisers that his customers relied upon in claiming

charitable donation deductions.

52.     Ehrlich predominantly used two appraisers, Appraiser 1 and Appraiser 2.

53.     Ehrlich or Abbey Art would typically pay the appraisers directly, rather than the

customers paying the appraisers.

54.     The appraisers Ehrlich and/or Abbey Art hired did not meet the requirements to

be "qualified appraisers" under the Internal Revenue Code.  *See* I.R.C. § 170(f)(11).

55.     In all years relevant to this counterclaim, the appraisers Ehrlich and/or Abbey Art

hired performed the majority of their appraisals for, and received the majority of their appraisal

income from, Ehrlich and/or Abbey Art.

56.     The appraisers drafted written appraisals for each artwork a customer intended to

donate in a given tax year, and conveyed a collection of their written appraisals and

accompanying documents—including an affidavit signed by the appraiser describing their

valuation methodology and the appraiser's curriculum vita—to Abbey Art for delivery to the customers.

57.     The written appraisals and accompanying documents referenced in the paragraph above are referred to hereafter as "appraisal reports."

58.     The appraisal reports generally did not state whether the appraisers viewed the artworks in person or via photographs.

59.     The appraisal reports did not identify contemporaneous sales of comparable artworks.

60.     The appraisal reports did not identify any sales of comparable artworks.

61.     The appraisal reports did not identify the most common markets for comparable artworks.

62.     The appraisal reports did not discuss the state of the art market at the time of the appraisals.

63.     The appraisal reports did not include any written descriptions or images of comparable artworks to justify the assigned value for any appraised artwork.

64.     The appraisal reports were not written in accordance with any generally-accepted appraisal standard.

65.     The appraisal reports grossly overvalued the subject artworks.

66.     The appraisal reports did not provide an explanation as to why the artworks had purportedly appreciated in value drastically from the time Abbey Art's customers purchased the artworks to the time they donated them, which was typically just one or two years later.

67.     The appraisal reports omitted the prices at which the customers had purchased the artworks from Abbey Art, and the prices at which Abbey Art had acquired the artworks.

68.     The artworks Abbey Art sold its customers were predominantly ceramics from Afghanistan and folk paintings from Ethiopia.

69.     True and correct photographs of an Afghani ceramic bowl and an Ethiopian folk painting sold by Abbey Art are reproduced below:

 

70.     The appraisals Abbey Art furnished to its customers typically valued Afghani ceramics at between $1,400 and $1,800.

71.     The appraisals Abbey Art furnished to its customers typically valued Ethiopian folk paintings at between $2,000 and $2,400.

72.     In several instances, Abbey Art's appraisers appraised a collection of artworks at a set percentage above the prices at which customers had purchased the artworks from Abbey Art.

73.     For example, Customer 6 purchased 40 Afghani ceramic vessels from Abbey Art at prices ranging from approximately $284 to approximately $360 per piece.  Appraiser 1 then appraised the vessels at values that were uniformly 357% higher than the purchase prices, ranging from $1,300 to $1,650.  Appraiser 1 did not disclose in her appraisal report that her methodology was simply to appraise the items at a set percentage above the purchase prices.

74.     Similarly, Customer 7 purchased 39 Ethiopian folk paintings from Abbey Art at

prices ranging from approximately $440 to approximately $639.  Appraiser 2 then appraised the paintings at values that were uniformly 354.55% higher than the purchase prices, ranging from $2,000 to $2,900.  Appraiser 2 did not disclose in his appraisal report that his methodology was simply to appraise the paintings at a set percentage above the purchase prices.

75.     The appraisals Abbey Art furnished to its customers generally concluded that artworks were worth 328% to 582% more than the total prices at which Abbey Art had purportedly sold them to the customers, which purported sales typically had occurred just one or two years before the appraisals.

76.     The actual fair market values of the artworks were substantially less than the values assigned to the artworks by the appraisers.  For example, in or about July 2019, a commercial auction house in Pennsylvania held a public auction for approximately 96 ceramic vessels from Mazar I Sharif, Afghanistan.  The vessels appear to have been consigned to the auction house by a donee of one of Abbey Art's customers, or were at least highly similar to the Afghani ceramic vessels Abbey Art sold to its customers.  The vessels sold at an average price of approximately $11.

77.     Similarly, in or about July 2019, the auction house in Pennsylvania held a public auction for 17 Ethiopian folk paintings.  The paintings appear to have been consigned to the auction house by a donee of one of Abbey Art's customers, or were at least highly similar to the Ethiopian paintings Abbey Art sold to its customers.  The paintings sold at an average price of approximately $27.

**EHRLICH'S SCHEME - STEP THREE:  THE CUSTOMERS DONATED THE
ARTWORKS AND CLAIMED A CHARITABLE DEDUCTION BASED ON FORMS
EHRLICH OR HIS AGENTS PREPARED**

78.     Abbey Art's customers generally allowed Ehrlich or his agents to determine the charity to which the artworks were donated.

79.     In some cases, Ehrlich and his agents did not give customers an option to choose a donee charity.

80.     The vast majority of artworks Abbey Art's customers donated were donated to Help for Orphans.

81.     Help for Orphans filed Forms 990 tax returns with the IRS for tax years 2015 through 2019 that stated that it "will purchase and retrofit buses to be able to utilize said buses as portable museums on wheels, to bring cultural displays to elementary school children."

82.     Several of Abbey Art's customers donated artworks to Help for Orphans at Ehrlich's suggestion or direction without knowing how Help for Orphans planned to use them.

83.     Abbey Art's customers did not physically deliver the artworks they donated to the donees.  Rather, they relied on Ehrlich or his agents to do so.

84.     In at least one instance, Ehrlich and his agents never delivered artworks for which a customer claimed a charitable deduction to a donee organization, despite telling the customer that they had in fact delivered the artworks.

85.     At or about the time of the donations, Ehrlich or his agents generally provided customers with a "Deed of Gift" form for them to sign.  The Deed of Gift form stated that the customers relinquished all right and title to the donated artworks to the donee, and were signed by a representative of the donee.  For example, Ehrlich wrote to Customers 8 and 9, a married couple, in an undated letter in approximately December 2016:

I am pleased to inform you that your gift of fine art objects has been accepted by

[DONEE'S NAME REDACTED] and your complete gift has been delivered to them. Enclosed you will find the originals of your appraisals along with copies of all the document[s] except for the 8283 form. The Deeds should be dated December 23, 2016 and one Deed fully executed by you should be returned to Abbey along with the check….

Pursuant to our Agreement, enclosed you will find an invoice for the balance of the purchase price of your art collection. Kindly remit your balance of $13,200 in the Federal Express envelope provided. The check should be made payable to Abbey Art Consultants. The office was unable to find verification for a deposit for the art which would have been $1,320.00. If you include a verification for this amount for 2016 then the final pay will be $11.880.00. Upon completion of a fully executed Deed and final payment you will receive from us a completed IRS Form 8283 executed by [DONEE'S NAME REDACTED] and your appraiser(s).

86.    Ehrlich sometimes directed customers to backdate their Deeds of Gift. For example, on or about December 30, 2010, Ehrlich wrote a letter to Customer 10 informing him that an educational institution had accepted his donation of artworks and asking him to pay "the balance of the purchase price for your art collection." Ehrlich further asked Customer 10 to "sign and date all deeds December 27, 2010 and return both deeds along with your check in the Federal Express envelope."

87.    At or about the time of the donations, Ehrlich or his agents generally provided his customers with a copy of an IRS Form 8283, a form used to report Noncash Charitable Contributions. Ehrlich or his agents generally had filled out the Form 8283 with information indicating (1) the date the customer had purportedly acquired the donated property; (2) how the customer acquired the property; (3) the amount of the customer's cost or adjusted basis in the property; (4) the date of the donation; and (5) the amount the customer claimed as a deduction. The forms generally had been signed by the appraiser and a representative of the donee organization.

88.    The cost basis Ehrlich or his agent listed on the Forms 8283 was generally the price at which the customer had purchased the artworks from Abbey Art.

89.     The amount Ehrlich or his agent listed as a claimed deduction on the Forms 8283 was generally the appraised value of the artworks as determined by the appraisers Ehrlich or his agents hired.

90.      Ehrlich's customers generally relied on and submitted to the IRS the Forms 8283 and other documents he and/or his agents prepared for them without change.

## EHRLICH PROMOTED AND SOLD THE TAX SCHEME

91.     Ehrlich promoted the art donation scheme as a way to reduce his customers' federal income tax liabilities and his customers participated in the scheme for that purpose. For example, on April 26, 2016, Ehrlich sent an email to Customer 5 stating: "We need to discuss the art donation amount … If I am correct you wanted to give away about $180,000 which will cost you $36,000.  You would pay $18,000 now and an additional $18,000 in early December.  As such you would save about $77,000 in taxes which would cost you $36,000.  Is this ok for you?"

92.     And as described in paragraph 46 above, on March 8, 2017, Ehrlich sent an email to Customer 5 stating:  "Did you determine how much art you need forv2016 [sic]? We have put aside appraised art of $180,000 at a cost of $38,000 with $10,000 down now and the balance due in August.  If you earned $600,000 gross for 2016 this is what you will need.  If you earned less just figure 30% of the applicable gross income."

93.     Ehrlich provided documents to customers that promoted the art donation scheme.

94.     For example, Ehrlich drafted and distributed a slide presentation titled "Abbey Arts Consultants, Inc. Charitable Art Advisory."  The presentation stated:

- "Abbey has a global Art sourcing network developed over the past 30 years."

- "Art is purchased by the client in a region that is typically undergoing a period of stress for ultimate donation to a domestic not-for-profit institution."

- "Abbey arranges for the acquisition, shipping, insurance, appraisal and warehousing of the Art on behalf of the client."

- "The client holds the Art for at least 1 year."

- "Post the 1 year holding period the client may donate the Art at the US retail value as determined by a qualified appraiser."

95.     The presentation described a "sample transaction" in which a pottery vessel was "acquired for approximately $700 in [an] emerging market country," then "appraised at US fair market retail value as per IRS rules by qualified appraiser for $3,000."  The presentation stated that the net result was that "for [a] client in 35% tax bracket the donation saves $350 in federal income taxes."

96.     The presentation included a chart that illustrated federal tax savings from the art donation scheme based on a projection that customers could buy artworks from Abbey Art at 24% of their appraised value.  The chart illustrated a "percentage return on donation" ranging from 10% to 52% based on the federal income tax liability the customer would otherwise have, and stated that that figure "represents an equivalent after-tax return."

97.     Ehrlich charged his customers to participate in the art donation scheme.

98.     The purchase price customers paid Abbey Art for the artworks also covered the services Abbey Art provided: warehousing, appraisal, and preparing the donation and tax documents.

99.     Ehrlich received gross income in excess of $461,448 from the scheme.

**EHRLICH'S STATEMENTS RELEVANT TO THE I.R.C. § 6700 PENALTY**

100.     Ehrlich made and caused his agents to make statements assuring Abbey Art's customers that they would be allowed to claim charitable donation deductions through the art donation scheme.

101.     For example, Ehrlich sent multiple letters to customers stating: "I trust your gift to the Orphans Schools will provide you with a significant tax savings in 2016."

102.    Similarly, Employee 1 wrote multiple letters to customers at Ehrlich's direction stating:  "You have now received from Abbey Art Consultants, Inc. all the necessary documents for filing the 2015 art donation portion of your tax return. The cumulative value of these frontice section(s) [i.e., the cumulative value of the appraisals] should total the same cumulative value as the amount claimed as a deduction on your 8283 IRS tax form for the year 2015."

103.    The "necessary documents" to which Employee 1's letter referred included appraisal reports and Forms 8283 filled out by Ehrlich and/or his agents as described above. Ehrlich and his agents intended for customers to submit those documents to the IRS in support of their claims for charitable donation deductions.

104.    Ehrlich made and caused his agents to make estimates and projections of allowable tax deductions that they provided to customers, including the estimates and projections in the Abbey Art slide presentation and letters and emails described in paragraphs 91 through 96 above.

105.    The appraisal reports Ehrlich furnished to Abbey Art's customers grossly overvalued the artworks his customers donated.

106.    The appraisal reports falsely stated that they were based on comparable sales in the open market, when the appraisers failed to identify any comparable sales.

107.    In several instances, the appraisal reports falsely stated that they were based on comparable sales when the appraiser simply valued the appraised artworks at a set percentage higher than the price at which Ehrlich had sold the artworks to his customers.

108.    The appraisals Ehrlich furnished to Abbey Art's customers were so grossly inflated and baseless as to be false.

109.    Ehrlich and his agents adopted and used the false statements in the appraisal

reports when they filled out Forms 8283 for customers that included the appraisal valuations as the claimed deduction amounts.

110.    Ehrlich and his agents advised customers that they could rely on the appraisal reports, despite the fact that they contained false statements, gross overvaluations, and failed to comply with the Internal Revenue Code for multiple other reasons, including that the appraisal reports were not "qualified appraisals," the appraisers were not "qualified appraisers," and customers generally did not legally own the artworks they donated for more than a year.

111.    In some instances, Ehrlich and/or his agents told customers that they had delivered artworks to a donee on the customers' behalf when they had not actually done so.

112.    Ehrlich's customers relied on the statements he and his agents made concerning the allowability of deductions through the art donation scheme.

113.    For example, one of Ehrlich's customers has described himself to the Tax Court as the "victim of a tax promoter scheme."

### EHRLICH KNEW OR HAD REASON TO KNOW THAT HIS STATEMENTS WERE FALSE

114.    Ehrlich held himself out to customers as a sophisticated art dealer and consultant.

115.    Ehrlich held himself out to customers as knowledgeable regarding the requirements for claiming charitable contribution deductions.

116.    Ehrlich knew, or had reason to know, that taxpayers may not use a property's appraised fair market value as the basis for claiming a charitable contribution deduction for donating that property unless they have owned that property for a year or longer.

117.    Ehrlich knew, or had reason to know, that his customers did not acquire legal ownership of the artworks he purportedly sold them at the time they made deposit payments.

118.    In 2011, the Tax Court issued an opinion disallowing a charitable contribution

deduction claimed by one of Abbey Art's customers, Customer 11, and upholding accuracy-related penalties assessed against him on the grounds that Customer 11 did not own the artworks he donated for more than a year.  *Williams v. Commissioner*, T.C. Memo 2011-89, 2011 WL 1518581.

119.    In its opinion, the Tax Court wrote:  "Commencing a holding period for hundreds of thousands of dollars of art donated in 1997, 1999, and 2000 by making a modest deposit in 1996 on an agreement that allowed [Customer 11] unfettered flexibility to choose whether or not to actually buy and donate any art at all was too good to be true."

120.    Ehrlich knew of, or had reason to know of, the Tax Court's opinion in *Williams* shortly after it was issued.

121.    Customer 11 appealed the Tax Court's opinion in *Williams* to the United States Court of Appeals for the Fourth Circuit, which affirmed the Tax Court's holding that Customer 11 failed to satisfy the one-year holding period required to claim a charitable deduction on the artworks at their appraised value.  *Williams v. Commissioner*, 498 Fed. Appx. 284 (4th Cir. 2012).

122.    Ehrlich knew of, or had reason to know of, the Fourth Circuit's opinion in *Williams* shortly after it was issued.

123.    Ehrlich knew, or had reason to know, that in order to substantiate a noncash charitable contribution deduction of $5,000 or more, a taxpayer must obtain a "qualified appraisal" from a "qualified appraiser."

124.    Ehrlich knew, or had reason to know, the requirements of being a "qualified appraiser."

125.    Ehrlich knew, or had reason to know, the requirements of preparing a "qualified

appraisal."

126.    Ehrlich knew, or had reason to know, that a "qualified appraisal" must apply one

of the valuation methodologies set forth in the Internal Revenue Code and implementing

Treasury Regulations.

127.    In its 2011 opinion in *Williams* cited in paragraph 118 above, the Tax Court *sua*

*sponte* commented that the appraisals Customer 11 had received from Abbey Art were "suspect."

The Court wrote:

> [Customer 11] also claimed that he believed the appraisals Abbey obtained were
> valid and accurate and that the 416-percent jump in value legitimately resulted from
> Abbey's purchasing the art oversees in third-world countries and in bulk. Abbey's
> guaranteed appreciation is suspect; and if the art is available at such deep discounts,
> the appraisals—purporting to represent prices a willing buyer and willing seller
> would negotiate—are also suspect.

128.    The Tax Court in *Williams* ultimately did not reach a holding on the validity of

the appraisals Abbey Art furnished to Customer 11 because that issue was not before it.

129.    Similarly, in its 2012 opinion in *Williams* cited in paragraph 121 above, the

Fourth Circuit *sua sponte* commented:  "It goes without saying that the appreciation guaranteed

to [Customer 11] by virtue of [his agreement with Abbey Art] is suspect, to say the least."

130.    The Fourth Circuit in *Williams* ultimately did not reach a holding on the validity

of the appraisals Abbey Art furnished to Customer 11 because that issue was not before it.

131.    Ehrlich knew, or had reason to know, that the appraisals he furnished to his

customers were suspect.

132.    Ehrlich knew, or had reason to know, that the appraisals he furnished to his

customers were grossly inflated.

133.    Ehrlich knew, or had reason to know, that the appraisals he furnished to his

customers were not based on comparable market sales, as they claimed to be, because the

appraisal reports did not cite any such comparable market sales.

134.    Ehrlich knew, or had reason to know, that the appraisal reports he furnished to his customers in several instances falsely stated that they were based on comparable sales when the appraiser actually appraised the subject artworks at a set percentage higher than the price at which Ehrlich had sold the artworks to his customers

135.    Ehrlich knew, or had reason to know, that the appraisals he furnished to his customers were so grossly inflated and baseless as to be false.

**COUNT I: VIOLATION OF I.R.C § 6700**

136.    The United States incorporates paragraphs 1 through 135 of this counterclaim, above, as if set forth herein.

137.    Any person who, in connection with organizing, promoting, or selling a plan or arrangement, or assisting in organizing, promoting or selling a plan or arrangement (a) makes or furnishes or causes another person to make or furnish a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter … is subject to a civil penalty. 26 U.S.C. § 6700(a)(1)-(2).

138.    Ehrlich's art donation scheme was a plan or arrangement within the meaning of 26 U.S.C. § 6700.

139.    Ehrlich sold or participated in the sale of the art donation scheme to at least 18 customers in and around the time period 2015 to 2017.

140.    In connection with selling the art donation scheme, Ehrlich made and furnished false statements regarding the allowability of charitable donation deductions.

141.    Ehrlich knew or had reason to know that these statements were false within the

meaning of 26 U.S.C. § 6700(a)(2)(A).

142.    In connection with selling the art donation scheme, Ehrlich made and caused to be made gross valuation overstatements related to the value of the donated artworks.

143.    Based on Ehrlich's conduct, on March 22, 2021, a delegate of the Secretary of the Treasury assessed a $230,724.00 penalty against him pursuant to 26 U.S.C. 6700(a)(2)(A).

144.    Notice of the March 22, 2021 assessment and demand for payment was given to Ehrlich on or about the date of the assessment.

145.    On April 9, 2021, Ehrlich made a payment of $35,000 towards the $230,724 assessed penalty.

146.    Despite notice and demand for payment, Ehrlich has failed to fully pay the amount owed.

147.    As a result, and after taking into account a credit of approximately $108,463 owed to Ehrlich and accrued interest on the unpaid balance, Ehrlich owes the United States approximately $90,128.25 as of March 7, 2022, plus statutory interest and additions accruing after March 7, 2022.

WHEREFORE, the United States respectfully requests that the Court enter a money judgment in its favor and against David Ehrlich in an amount to be determined at trial, and grant the United States its costs and such other and further relief as the Court deems just and proper.

Dated:  March 2, 2022

DAVID A. HUBBERT
Deputy Assistant Attorney General

ASHLEY C. HOFF
United States Attorney

*/s/ Brij B. Patnaik*
BRIJ B. PATNAIK
Illinois Bar # 6300524
HARRIS J. PHILLIPS
Massachusetts Bar # 675603
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 7238, Ben Franklin Station
Washington, D.C.  20044
Phone: 202-353-0703 (BP)
           202-616-1906 (HP)
Fax: 202-514-6770
Brij.Patnaik@usdoj.gov
Harris.J.Phillips@usdoj.gov

*Attorneys for the United States*