UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ESTATE OF DAVID EHRLICH, | § | No. 1:21-CV-01020-DAE |
| | § | |
| *Plaintiff and Counter-Defendant,* | § | |
| | § | |
| vs. | § | |
| | § | |
| UNITED STATES OF AMERICA | § | |
| (IRS), | § | |
| | § | |
| *Defendant and Counter-Plaintiff.* | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant and Counter-Plaintiff the United States of America's ( "the Government" or "IRS") Motion for Summary Judgment. (Dkt. # 62). Plaintiff timely filed a response, and the Government timely replied. (Dkt. ## 65, 68.)

The Court finds this matter suitable for disposition without a hearing. After careful consideration of the parties' briefs and the relevant law, the Court **GRANTS** the Government's Motion for Summary Judgment. (Dkt. # 62.)

1

BACKGROUND

The instant case concerns the operations of David Ehrlich, President and sole owner of Abbey Art Consultants, Inc. (Dkt. # 9 at 8, 11; Exh. A, Dkt. # 60-4, at 19:13–19; Exh. 401, Dkt. # 65-43.) Beginning in the 1990s, Abbey Art was in the business of buying, storing, and donating art for the purpose of facilitating tax deductions for its clients. (Exh. B, Dkt. # 65-2, at 14:15–21.) The art donation operation was Abbey Art's sole business. (Id. at 33:5–11.) David Ehrlich was the art donation operation's promoter, was responsible for obtaining most of its customers, and was aware of all aspects of its business. (Id. at 14:15–15:5; 19:13–19; 118:15–18.) He had one long-term employee, Mitchell Chipin, who worked for Abbey Art since the mid-1990s. (Id. at 18:14–19:10.) Chipin's role was primarily to fill out paperwork and deal with customers. (Id. at 19:13–18.)

Abbey Art took advantage of a provision in the Internal Revenue Code ("I.R.C.") which allows individuals to claim an income tax deduction for non-cash property donated to charity at the property's appraised fair market value instead of the price at which they purchased it. See U.S.C. § 170. To be able to claim the fair market value for deduction purposes, certain conditions must be met, including that the property must be owned by the taxpayer for at least one year

before donation, and any deduction claim more than $5,000 is supported by a qualified appraisal.  26 U.S.C. § 170(e), (f)(11).

The art donation process operated as follows.  David Ehrlich would travel to other countries to purchase art.  (Exh. A, Dkt. # 65-1, at 39:23–41:4.)  The art was then stored in facilities owned by Abbey Art in Manhattan and Newburgh, New York.  (Exh. A, Dkt. # 60-4, at 80:1–81:22.)  At the beginning of the year, Abbey Art sent a form letter to its clients, listing the client's total cost for the artworks, estimated appraised fair market value, and requesting a deposit payment.  (Id. at 51:9–53:12; Exh. 315, Dkt. # 65-42.)  The letter also informed the clients that their ownership of the art was confirmed as of the date the art pieces were "set aside" into segregated storage and reminded clients of the one-year holding period required to claim tax deductions on future donations.  (Exh. 315, Dkt. # 65-42.)  Abbey Art would then hold the art for approximately a one-year period, then donate the artworks and provide customers with completed appraisals and pre-filled tax forms indicating clients could take deductions in the amount of the appraised value of the art.  (See Exh. 250, Dkt. # 60-36; Exh. 257, Dkt. # 65-39.)

The estimated purchase price was typically quoted at about 20% of the "estimated appraised fair market value"—the estimated appraised value after one year.  (Exh. A, Dkt. # 60-4, at 57:11–61:18).  Thus, the amount clients were quoted for the artwork was four to five times less than the amount that was

3

ultimately claimed as a tax deduction.  (See id.)  Further, the deposit payment, the only payment received before the donation, was typically 5–10% of the total purchase price.  (Id. at 15:6–16:13; 79:3–18.)  The total balance was not due until after proof of donations had been made.  (Id. at 16:1–13.)

On March 22, 2021, the IRS assessed penalties in the amount of $230,724 against Ehrlich under section 6700 of the IRC for promoting a tax shelter.  (Dkt. # 9 at 143.)  After paying $35,000 toward that penalty, David Ehrlich filed the instant suit, seeking a refund of the $35,000 and requesting abatement of the full penalty.  (Dkt. # 1.)  During the pendency of litigation, David Ehrlich passed away, and the Estate of David Ehrlich ("the Estate") was substituted as a party in his stead.  (Dkt. # 29.)  After the Estate was substituted, the Government filed an Amended Counterclaim seeking judgment on an additional $1,097,224 penalty that was assessed on September 11, 2023.  (Dkt. # 36 at 2.)

The Government filed the instant Motion for Summary Judgment, seeking a money judgment of the remaining penalty balance from the Estate and judgment in their favor on Plaintiff's refund claims.

LEGAL STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED.

R. CIV. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

At the summary judgment stage, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  Wease v. Ocwen Loan Servicing, LLC, 915 F.3d 987, 992 (5th Cir. 2019).  However, "unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012).

DISCUSSION

I.    Appropriate Standard of Proof

As an initial matter, the parties dispute the applicable standard of proof for violations of I.R.C. § 6700. The Government urges the Court to apply a preponderance of the evidence standard, following the majority of courts that have considered this issue. See United States v. Fontenot, No. 1:09-cv-782, 2011 WL 13195835, at *6 n.10 (E.D. Tex. Aug. 29, 2011) (collecting cases). The Estate instead advocates for the application of a clear and convincing evidence standard, noting that the Fifth Circuit affirmed a district court case that tasked the government with proving each element of section 6700 by clear and convincing evidence. See United States v. Campbell (Campbell I), 704 F. Supp. 715, 725 (N.D. Tex. 1988), aff'd as modified by United States v. Campbell (Campbell II), 897 F.2d 1317 (5th Cir. 2020).

In its review of 5th Circuit precedent on this issue, the Court agrees that while the appellate court did not address the question of which standard applied, it did "agree with the district court's application of the law," seeming to endorse the lower court's approach. Campbell II, 897 F.2d at 1320. Using a clear and convincing standard is further supported by the fact that the burden is on the government to prove their case by clear and convincing evidence in taxpayer fraud cases under other sections of the Internal Revenue Code. Marsellus v. C.I.R., 544

F.2d 883, 885 (5th Cir. 1977) (citing Webb v. Comm'r of Internal Revenue, 394

F.2d 366, 378 (5th Cir. 1968)).

Accordingly, the Court will require each element of section 6700 to be

proven by clear and convincing evidence. United States v. Fontenot, No. 1:09-cv-

782, 2011 WL 13195835, at *6 (E.D. Tex. Aug. 29, 2011) (similarly applying a

clear and convincing evidence standard in light of Campbell).

II.    Plaintiff's Alleged Violation of § 6700(a)(2)(A)

Section 6700(a)(2)(A) pertains to penalties for false statements made

in connection with an organization or sale. 26 U.S.C. § 6700(a)(2). To show

violation of section 6700(a)(2)(A), "the government must prove that a person (1)

made or furnished a statement with respect to tax benefits (2) which he . . . had

reason to know (3) was false or fraudulent (4) as to a material matter." U.S. v.

Campbell II, 897 F.2d 1317, 1320 (5th Cir. 1990).[1] A "material matter" is one

"which would have a substantial impact on the decision-making process of a

reasonably prudent investor and include matters relevant to the availability of a tax

benefit." Id. Two types of statements are barred by section 6700(a)(2)(A):

---

[1] A prerequisite element to section 6700(a) is that statements are made by someone who "organizes a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement, or participates (directly or indirectly) in the sale of any interest in an entity or plan or arrangement." § 6700(a)(1)(A). Neither party appears to dispute that Ehrlich, through Abbey Art, operated a plan within the meaning of this statute. (See also Exh. A, Dkt. # 60-4, at 53:2-12.)

"statements directly addressing the availability of tax benefits," and "those concerning factual matters that are relevant to the availability of tax benefits." Id.

The Government alleges that Ehrlich made two categories of false statements barred by section 6700. First, they allege that Ehrlich and Chiplin made false statements when he told customers that they acquired ownership of art for purposes of claiming a deduction at the time it was "set aside" for them in a storage unit, or when the customers paid their deposits on the art (hereinafter, "Statements Regarding Acquisition"). (Dkt. # 68 at 3.) Second, the IRS alleges that Ehrlich and Chiplin made false statements upon telling customers that they could claim deductions based on the art's appraised value, and that they could rely on those statements in claiming deductions (hereinafter, "Statements Regarding Appraisal").[2] (Id.)

A.    Statements Made as to a Material Matter

There is clear and convincing evidence that Ehrlich himself made statements as to a material matter when he advised clients on the tax deductions they were able to take. The IRS has produced emails in which Ehrlich informed at

---

[2] In their Response, Plaintiff appears to construe the Government's counterclaim for penalties related to the Appraisal Statements as a counterclaim for penalties under section 6700(a)(2)(B) for gross valuation overstatements. However, in their reply, the Government clarifies they do not purport to bring counterclaims under section 6700(a)(2)(B); instead, they only allege that "Ehrlich's statements to customers that they could *rely* on the appraisals were knowingly false and fraudulent." (Dkt. # 68 at 8-9 n.13.)

least one client of her tax savings from the art donations.  (Exh. 234, 239, Dkt. ##
60-34, 60-35.)  One deposition of a former client suggests similar statements were
made to him as well.  (Exh. H, Dkt. # 60-11, at 47:13-49:13) ("But to a large extent
I was relying on [Abbey Art's] expertise and services as it relates to the
donations.")

       The IRS further provides sufficient evidence demonstrating that
Ehrlich made statements both on the timing of acquisition of the art and the
reliability of the appraisals.  The Government points to client letters in which
Ehrlich confirmed the clients' ownership of art at the time the pieces were set aside
for them, before the deposits were made.  (Exh. ## 11, 31, 251, Dkt. # 60-14, 60-
16, 60-37.)  This is further supported by the deposition of Mitchell Chipin, who
testified that one such letter was a "representative example" of the letters Abbey
Art sent to clients, and that Ehrlich was the one who wrote them.  (Exh. A, Dkt. #
60-4, at 53:2-12.)  Further, the IRS produces evidence showing that Ehrlich filled
out tax forms for their clients, claiming a deduction amount based on the artworks'
appraised values.  (Exh. ## 29, 250 Dkt. ## 60-15, 60-36.)

       Moreover, Plaintiff's response does not appear to dispute that Ehrlich
made statements as to the availability of tax benefits; rather, the response focuses
on the "false and fraudulent" and "knowledge" elements of section 6700.  (See
Dkt. # 65.)  Plaintiff does contest, however, the attribution of acts by Mr. Chipin or

Abbey Art as a company to Mr. Ehrlich for the purposes of penalties.  (Dkt. # 65 at 10) ("[I]t was Chipin, not Ehrlich, who made the representation.").  Plaintiff argues that even if Mr. Chipin's statements could be attributed to Abbey Art, since the at-issue penalty was assessed against Mr. Ehrlich personally, Mr. Chipin's statements cannot be used to support penalties against Ehrlich.  (Id. at 10 n.3.)  The Government counters that statements made by Chipin were "caused" to be made by Ehrlich within the meaning of section 6700.  26 U.S.C. § 6700(a)(2) (holding liable a person who "makes or furnishes or *causes another person to make*" statements) (emphases added).

Mr. Chipin made it clear in his deposition that Mr. Ehrlich made the decisions for the company and typically had at least some level of involvement in the legal, financial, and executive decisions.  (Exh. A, Dkt. # 60-4, at 19:13-20:4, 120:11-15, 140:11-18.)  Chipin further testified that even when he typed up the letters, Ehrlich was the one who wrote them.  (Id. at 53:5-12.)  Plaintiff has not directed the Court to any evidence suggesting that Chipin was not acting under Ehrlich's control.  (See Dkt. # 65.)  Thus, the Court finds that it is appropriate to consider Mr. Chipin's acts as well where they were conducted at the direction of Mr. Ehrlich.

Finally, as to materiality, the timing of the applicable holding period for artworks prior to donation and the assessed value of those donated artworks are

both issues "which would have a substantial impact on the decision-making

process of a reasonably prudent investors" and pertain to the availability of the tax

benefits Ehrlich facilitated.  See Campbell II, 897 F.2d at 1320.  Neither party

appears to dispute that the statements concerned material matters.  Accordingly, the

Court finds that the Government has adduced sufficient evidence to demonstrate

Plaintiff's liability for penalties under section 6700 as to the first and fourth

elements.  See id.  The Court further finds no genuine issue of material fact on

these elements.  See Celotex Corp., 477 U.S. at 323.

      B.    False or Fraudulent

      The IRS alleges that Ehrlich's statements were false and/or fraudulent

with respect to whether (1) ownership began at the time artwork was set aside, and

(2) clients could rely on appraisal values for deduction purposes.  (Dkt. # 62.)

Plaintiff disputes both points.  (Dkt. # 65.)

      The Government asserts that Ehrlich's statements regarding his

clients' ownership of art pieces were false because they represented that the clients

owned the art at the time it was "set aside" for them or at the time the customers

made their deposits.  (Dkt. # 62 at 19.)  Their theory is that the clients did not

actually acquire ownership over the art because they had no obligation to pay the

remaining balance owed, and that at most, they had options to purchase the art.

(Id. at 19-20.)  Their theory relies on a Tax Court case involving one of Abbey

Art's clients, Mr. Williams.  Williams v. Comm'r, T.C. Memo. 2011-89, 2011 WL 1518581 (Apr. 21, 2011) (hereinafter "Williams I"), affirmed 498 F. App'x 284, 297 (4th Cir. 2012) (hereinafter "Williams II").

In that case, the Tax Court considered whether Williams owned art for more than a year before he donated it, pursuant to the requirements of 26 U.S.C. § 170(e), after the IRS challenged this contention based on his alleged art purchases from Abbey Art.  Id. at *16.  The Tax Court analyzed an agreement between Abbey Art and Mr. Williams titled, "Art Purchase Agreement," and considered whether Williams was actually obligated to purchase the art he purported to own.  Id.  The Tax Court concluded that the "agreement" did not confer ownership to Mr. Williams, but rather an option to buy art, where Abbey Art had no "explicit right to force Mr. Williams's payment."  Id.  at *17.  The decision was based in part on the language of the agreement, which the court found did not create mutual obligations on both parties.  Id.  On appeal, the Fourth Circuit upheld the Tax Court's decision, finding that the "holding period for purposes of the long-term gain calculation did not begin until he paid for and acquired a present interest in the art," which did not yet occur when only the deposit was paid without further obligations to pay the remaining balance.  Williams II, 498 F.App'x at 297.  Both courts in the Williams cases made critical comments on the arrangement Williams had with Abbey Art.  Williams I, 2011 WL 1518581 at *19 ("Commencing a holding period for

12

hundreds of thousands of dollars of art donated in 1997, 1999, and 2000 by making a modest deposit in 1996 on an agreement that allowed Mr. Williams unfettered flexibility to chose [sic] whether or not to actually buy and donate any art at all was too good to be true.  This manufactured tax benefit was enough to alert a reasonable and prudent person that additional scrutiny was required."); Williams II, 498 F.App'x at 296 n.13 ("It goes without saying that the appreciation guaranteed to Williams by virtue of this Agreement is suspect, to say the least.").

The Government argues that the Williams decisions are persuasive here, alleging that there was no mutual agreement between Ehrlich and his customers that would give them ownership over the artwork at the time of his emails to them.  As previously noted, the Government produces several letters to Abbey Art clients representing and confirming that their ownership of the art predated any forthcoming deposit and was rather established as of the date the art was set aside.  (Exh. ## 11, 31, 251, Dkt. # 60-14, 60-16, 60-37.)  The remaining question is whether such statements were false.

Finding no contrary Fifth Circuit authority on this question, the Court is persuaded by the reasoning in Williams leading to the conclusion that ownership of the artwork does not transfer before mutual obligations are present on both parties.  See 498 F.App'x at 297.  Further, the Government has adduced clear and

convincing evidence that Ehrlich's statements were false because no mutual obligations existed.

The IRS provides deposition testimony from Mr. Chipin saying there were no written agreements between Ehrlich and his clients to govern the sale of the art during the relevant time period.  (Exh. A, Dkt. # 60-4, at 78:13–79:2.)  The Government has also shown evidence that in some cases, Ehrlich's clients did not pay for the artworks in full until after he had donated them.  (See, e.g., id. at 95:1–18; Exh. # 55, Dkt. # 60-18; Exh. # 146, Dkt. # 60-28.)  Further, there is evidence that the deposit and purchase prices could be revised or even refunded if the client decided not to donate art in that year.  (Exh. A, Dkt. # 60-4, at 109:18–110:22, 59:15–18.)  Finally, Defendant's evidence indicates that Ehrlich's clients did not know the specific art they were paying for, (id. at 79:19–22), did not take physical possession of the art, and generally did not visit the art in the storage units or even see it prior to donation.  (Id. at 88:20–89:8; Exh. H, Dkt. # 60-11, at 25:5–7.)

Having found that the Government has carried its burden in proving Ehrlich's statements regarding ownership were false, the burden now shifts to the Estate to show specific facts creating a genuine issue of material fact.  See Matsushita, 475 U.S. at 587.  Here, the Estate has not done so.

The bulk of the Estate's response focuses on attempting to distinguish Williams from these facts because Ehrlich's clients in the penalized time period did

not have written contracts with Ehrlich like Mr. Williams.  (Dkt. # 65.)  The response further relies on testimony from Abbey Art clients who said their understanding was that they purchased the art at the time of the deposit, and that they did have obligations to fully pay for the art.  (See, e.g., Exh. D, Dkt. # 65-4, at 103:15–21, 105:25–106:2; Exh. H, Dkt. # 60-11 at 102:7–13.)  However, after the IRS produced sufficient evidence indicating there were no contracts and therefore no mutual obligation, the Estate bore the burden of producing specific facts creating a genuine issue of material fact as to whether a contract, and therefore mutual obligations, existed between Ehrlich and his clients.

Even after drawing reasonable inferences in their favor, Plaintiff's production of testimony that the clients subjectively believed they had to pay the remaining balance is insufficient to create a genuine issue of material fact here. Further, the Estate does not appear to argue in their response that any enforceable agreements between the parties existed, whether oral contracts or written—Plaintiff explicitly denied that the letters from Ehrlich constituted written contracts, and did not argue the existence of an oral contract between the parties.  (See Dkt. # 65 at 10–11.)  To survive summary judgment, the Estate needed to show facts showing that there were remaining issues for trial.  See Matsushita, 475 U.S. at 587.

Because they have failed to do so, the Court finds there are no genuine issues of material fact on whether Ehrlich's statements regarding ownership were false. [3]

C.    Knowledge

The parties next dispute whether Ehrlich knew or should have known that his statements regarding ownership and statements regarding appraisals were false or fraudulent.  In determining whether a person knew or had reason to know that statements were false or fraudulent, a court considers the following factors: "(1) the extent of the defendant's reliance upon knowledgeable professionals; (2) the defendant's level of sophistication and education; and (3) the defendant's familiarity with tax matters."  Anderson v. I.R.S., 442 F. Supp. 2d 365, 372 (E.D. Tex. 2006) (quoting United States v. Estate Preservation Servs., 202 F.3d 1093, 1103 (9th Cir. 2000)).  "Further, the 'reason to know' standard allows a court to impute knowledge to a defendant 'so long as it is commensurate with the level of comprehension required by [his] role in the transaction.'"  Fontenot, 2011 WL 13195835, at *6 (E.D. Tex. Aug. 29, 2011) (quoting Campbell II, 897 F.2d at 1322).

First, neither party appears to bring evidence supporting that Ehrlich relied upon other knowledgeable professionals before making statements to his

---

[3] Because the Court has found that Ehrlich made false statements on the issue of the ownership timing, the Court need not reach the parties' remaining arguments on whether the statements regarding appraisals were false or fraudulent.

clients concerning their ownership of the art.[4]  Indeed, when asked whether Ehrlich

relied on advice from anyone else regarding the potential tax implications of the

Abbey Art transactions, the Estate conceded as much, answering "no" to the

Government's interrogatories on the question.  (Exh. 404, Dkt. # 60-46, at 2.)  This

factor, then, weighs in favor of Ehrlich's knowledge.

      Second, as to Ehrlich's level of sophistication and education, the

Court finds that Ehrlich can be viewed as a sophisticated businessman due to his

role in Abbey Art as its President and its decisionmaker on executive, legal, and

financial decisions.  (Dkt # 9 at 11; Exh. A, Dkt. # 60-4, at 19:13–19.)  Further, Mr.

Ehrlich maintained sole ownership of Abbey Art through a trust; at all relevant

times, Abbey Art was wholly owned by DE Trust, a trust of which Mr. Ehrlich was

the sole beneficiary.  (Dkt. # 9 at 8; Exh. 401, Dkt. # 65-43.)  The same evidence

shows Ehrlich's familiarity with tax matters.  Thus, factors two and three thus

weigh in favor of Ehrlich's knowledge that the statements regarding ownership

were false.

---

[4] The Court does note that in Ehrlich's original complaint, he alleges that "[b]efore
Abbey Art was formed, Mr. Ehrlich was advised by his then lawyer, who is now
deceased, that he could donate art and deduct the fair market value at the time of the
donation provided certain conditions were met." (Dkt. # 1 at ¶ 14.) However, neither
party brings evidence to that effect, or alleges that Ehrlich relied on that lawyer's
statements when making false representations to his own clients. Accordingly, the
Court finds this allegation insufficient to raise an issue as to the first factor here.

Accordingly, in balancing these factors, the Court finds that all three factors favor the result that Ehrlich knew or should have known that his statements regarding ownership were false or fraudulent.  Further, the result is appropriate given Ehrlich's role in Abbey Art as its sole owner and President—in essence, its "architect."  See Campbell II, 897 F.2d at 1322 ("Because Allen Campbell was the architect of the Coral plan, we agree with the district court that he knew or should have known that his representations of deductibility were false.").

Finally, the Court is persuaded that Ehrlich's knowledge of the Williams case is pertinent to the knowledge analysis on these particular statements. The Fourth Circuit in the Williams II case specifically found that the "holding period for purposes of the long-term gain calculation did not begin until [Williams] paid for and acquired a present interest in the art[,]" 498 Fed. App'x at 297, and the Tax Court in Williams I similarly stated that "Mr. Williams's holding period for the art he had the option either to buy or not buy did not begin until he exercised the option, committed himself to paying for the art, and acquired a present interest in the art."  2011 WL 1518581 at *17.  Ehrlich himself admitted he knew of the Williams I decision in his complaint, (Dkt. # 1 at ¶ 36), and Mr. Chipin testified to the same effect.  (Exh. A, Dkt. # 60-4, at 167:5–170:14.)  Thus, Ehrlich presumably had read the decisions and should have known that his statements regarding ownership were false.

Further finding that the Estate has not shown any evidence suggesting that Ehrlich had no such knowledge, the Court finds there is no genuine issue of material fact as to this element for the false statements regarding ownership of art.

III.    <u>Whether Assessed Penalties are Proper</u>

The parties finally dispute whether the assessed penalties are proper. The Estate and the Government advance different standards by which to analyze the IRS's penalties.  Finding no Fifth Circuit law interpreting this issue, the Court looks beyond this circuit for persuasive authority.

The Government asserts that they are entitled to a presumption that their penalties are correct after establishing a promoter's liability under section 6700.  For this proposition, they cite <u>In re MDL-731 Tax Refund Litig. v. United States</u>, 989 F.2d 1290, 1303 (2d Cir. 1993) ("[T]he government was entitled to a presumption that its assessment of the penalties was correct.") (<u>citing</u> <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933)).  The IRS says the penalties were calculated by taking 50% of Abbey Art's gross income for the years 2013–2021, less an estimated cost of goods sold for the artworks.  (Dkt. # 62 at 24–25.)

The Estate advances another theory articulated in a Northern District of Alabama case, <u>Weir v. United States</u>, in which the district court required the IRS to prove false representations for "each and all of the 34 sales that the IRS

19

contends were violations of § 6700." 716 F.Supp. 574, 582 (N.D. Ala. 1989). The Estate argues that the evidence the Government provides is merely a "handful of isolated examples of alleged and disputed conduct."[5]

The Court agrees with the Government that the bulk of the existing case law on this question supports the conclusion that the IRS is owed a presumption of correctness on their penalty assessments and may assess a penalty of 50% of Abbey Art's gross income against Ehrlich, and now Ehrlich's Estate. See, e.g., In re MDL-731 Tax Refund Litig., 989 F.2d at 1303; Tarpey v. United States (Tarpey I), 2019 WL 5820727, at *2–4 (D. Mont. 2019). In particular, the Court finds the thorough reasoning in the Ninth Circuit's decision affirming the district court in Tarpey to be well-reasoned and persuasive. Tarpey v. United States (Tarpey II), 78 F.4th 1119, 1129 (9th Cir. 2023) ("It would go against the text and common sense to limit liability only to the false statements when Congress's goal was to punish abusive tax shelters."). Accordingly, the Court adopts the Government's approach to analyzing whether the assessed penalties are proper.

Thus, the Court adopts the presumption that the IRS's assessed penalties are correct. This does not, however, mean that the Court mechanically

---

[5] The Court finds this statement misrepresents the evidence as to Ehrlich's statements regarding ownership. The false statements at issue were made in form letters, which Mr. Chipin said were representative of those sent to clients. (Exh. A, Dkt. # 60-4, at 52:9–53:12.)

accepts the Government's damages; the Estate had the opportunity to rebut such a

presumption.  In their response, the Estate dedicates much of their discussion on

the proper amount of any penalty to advocating for application of the Weir standard

in this case.  However, they also note that the Government does not identify the

number of Abbey Art clients served over the relevant time period, 2013–2021, and

points out that several of the clients deposed in this case only donated art for part

of that time period.  (Dkt. # 65 at 22.)  The Court finds this information to be

immaterial to the penalties, given that the policy rationale of section 6700 supports

the conclusion that it is the activities of the tax shelter as a whole, rather than the

individual transactions within the tax shelter, that give rise to the punishment.  See

Tarpey II, 78 F.4th at 1129.  Because the Court has already found liability, these

facts do nothing to impact the penalty amounts.

         The Court further finds the penalties are proper here where they are

calculated using the prescribed method in section 6700 and the Estate has not

alleged any mathematical errors or disputed that the income of Abbey Art can be

attributed to Ehrlich as its sole owner.  § 6700(a) ("[I]f any activity with respect to

which a penalty imposed under this subsection involves a statement described in

paragraph (2)(A), the amount of the penalty shall be equal to 50 percent of the

gross income derived (or to be derived) from such activity by the person on which

the penalty is imposed.").

21

CONCLUSION

For the reasons stated, the Court **GRANTS** the IRS's Motion for Summary Judgment.  (Dkt. # 62.)  Because the Motion identified a need for subsequent submissions of the parties as to the amount of interest, the Parties are **ORDERED** to make such submissions clarifying the exact amount of the final judgment **on or before March 4, 2026.**

**IT IS SO ORDERED.**

**DATED**: Austin, Texas, February 4, 2026.

_____
David Alan Ezra
Senior United States District Judge

22